IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| John D. Barrett, Sr., | ) | C/A No.: 1:14-2398-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Timothy M. Cain dated July 3, 2014, referring this matter for disposition. [ECF No. 13]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 9].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claims for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether

she applied the proper legal standards.[1] For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

## I.    Relevant Background

### A.    Procedural History

On July 26, 2010, Plaintiff filed applications for DIB and SSI in which he alleged his disability began on February 1, 2010. Tr. at 167–71, 173–93. His applications were denied initially and upon reconsideration. Tr. at 79–83, 86–88, 89–91. On November 8, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Peggy McFadden-Elmore. Tr. at 41–70 (Hr'g Tr.). The ALJ issued an unfavorable decision on December 7, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 19–40. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 5–9. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 16, 2014. [ECF No. 1].

### B.    Plaintiff's Background and Medical History

#### 1.    Background

Plaintiff was 48 years old at the time of the hearing. Tr. at 45. He completed two years of college. Tr. at 47. His past relevant work ("PRW") was as an agricultural commodities inspector. Tr. at 64. He alleges he has been unable to work since February 1, 2010. Tr. at 45.

---

[1] Plaintiff also filed a motion to admit new evidence, which the undersigned addresses as part of this order. *See* ECF No. 10.

2.    Medical History

Plaintiff was hospitalized at Palmetto Health Baptist from December 22, 1999, to January 3, 2000, with depression and extreme anxiety. Tr. at 430. He was involuntarily committed after assaulting his wife. *Id.* Psychological testing demonstrated adjustment disorder with mixed emotional features and potential for brief psychotic reactions, as well as alcohol abuse. Tr. at 431. He demonstrated some dependent and avoidant personality traits. *Id.* Plaintiff's discharge diagnoses included alcohol abuse, brief reactive psychosis, and adjustment disorder with disturbance of mood and conduct. *Id.*

Plaintiff received intermittent psychiatric treatment with Timothy Malone, M.D., from March 15, 2000, through February 11, 2004. Tr. at 440–49. Notes from these visits are generally illegible.

Plaintiff was hospitalized on the adult psychiatric ward at Palmetto Health Baptist from January 2, 2006, to January 10, 2006, secondary to severe depression with suicidal ideation. Tr. at 434. Plaintiff indicated he was going through a divorce and was unable to see his children. *Id.* He reported poor sleep, crying spells, helplessness, hopelessness, worthlessness, anhedonia, increased anxiety, and poor appetite. *Id.* Plaintiff's final diagnoses included major depressive disorder and mixed personality trait. Tr. at 435.

Plaintiff followed up with Dr. Malone on February 6, 2006. Tr. at 439. He reported doing well and did not follow up thereafter. *Id.*

On January 30, 2010, Plaintiff presented to Kershaw Health Medical Center ("Kershaw Health") with vague complaints of things bothering him. Tr. at 285. He was described as uncooperative, vague, and evasive. Tr. at 286. Plaintiff attempted to leave

the emergency department, but he was stopped by a nurse and the police were called. Tr. at 287. Plaintiff was transferred to Palmetto Baptist for inpatient treatment, where he remained until March 2, 2010. Tr. at 288, 289. Plaintiff endorsed paranoid thoughts, was irritable, was guarded in his interaction with staff, and refused to comply with medication orders until he was court-ordered to comply with treatment. Tr. at 292–93. After he became compliant with treatment, he complained that Seroquel made him feel sedated and lightheaded. Tr. at 293. Seroquel was discontinued, but later prescribed again after other medications produced more significant side effects. *Id.* After resuming use of Seroquel, Plaintiff became more compliant and his mood and affect improved. *Id.* Jennifer E. Heath, M.D. ("Dr. Heath"), indicated final diagnoses including major depressive disorder with psychotic features, possible paranoid personality disorder traits, pernicious anemia, and hypertension. Tr. at 291. Dr. Heath indicated a global assessment of functioning ("GAF")[2] score of 55 at the time of discharge. *Id.*

Plaintiff presented to Robert K. Hotchkiss, M.D. ("Dr. Hotchkiss"), at Kershaw County Mental Health Center ("Kershaw Mental Health") for an initial physician's assessment on March 29, 2010. Tr. at 335–37. Dr. Hotchkiss described Plaintiff's insight as poor, but indicated no other abnormalities on the mental status examination. Tr. at 336. He assessed a GAF score of 50. *Id.*

---

[2] The GAF scale is a means of tracking clinical progress of individuals with respect to psychological, social, and occupational functioning. *Diagnostic & Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision ("*DSM-IV-TR*") at 32. The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.* at 33.

Plaintiff presented to Kershaw Health on May 18, 2010, for a psychiatric evaluation after becoming aggressive with his mother. Tr. at 301. Plaintiff reported that his mother "came to his door banging on the door" and told him that he had an appointment. Tr. at 301. Plaintiff reported that he had rescheduled the appointment earlier in the week and was frustrated. Tr. at 301, 304. He was not exhibiting symptoms of psychosis and denied suicidal or homicidal ideations. Tr. at 304. He was discharged and instructed to follow up with mental health. Tr. at 303.

Plaintiff was involuntarily committed to Palmetto Health Baptist from June 29, 2010, to August 27, 2010, for psychosis. Tr. at 313. Upon admission, he was slightly agitated and his affect was irritable and constricted. Tr. at 313. He had some difficulty with attention and concentration and his thoughts were disorganized. *Id.* He had "very significant paranoid delusions." *Id.* His insight and judgment were poor. Tr. at 313–14. Plaintiff's medications were adjusted several times during his hospitalization. Tr. at 314. His thoughts and mood improved by the end of July, but his symptoms were exacerbated when he had contact with his family. Tr. at 315. Finally, after a family meeting on August 19, plans were made for Plaintiff's discharge. Tr. at 316. Dr. Heath indicated a final diagnosis of schizophrenia, paranoid type. Tr. at 313. Plaintiff was also diagnosed with chronic obstructive pulmonary disease ("COPD") and was prescribed bronchodilators. Tr. at 311.

On September 9, 2010, Plaintiff presented to Michael Kulungowski, M.D. ("Dr. Kulungowski"), at Kershaw Mental Health. Tr. at 332–34. His target symptoms for treatment included anxiety, delusions/paranoia, and legal problems. Tr. at 333. He

indicated that his mother was "the problem." *Id.* Although Plaintiff's mental status examination was normal, Dr. Kulungowski assessed a GAF score of 40. Tr. at 334. Plaintiff was instructed to "[g]et on meds." *Id.*

Plaintiff presented to Leon Hunt, M.D. ("Dr. Hunt"), at Caresouth Carolina on September 30, 2010, for a refill of his blood pressure medication. Tr. at 398. His oxygen saturation was 98 percent. *Id.* He complained of no pain and indicated he exercised three times per week. *Id.* Dr. Hunt refilled Plaintiff's prescription for Lotensin. *Id.*

On October 4, 2010, Kevin King, Ph. D. ("Dr. King"), completed a psychiatric review technique in which he indicated Plaintiff's impairment was severe, but not expected to last 12 months. Tr. at 338. He considered Listings 12.04 and 12.08. *Id.* He indicated Plaintiff had major depressive disorder with psychotic features and paranoid personality traits. Tr. at 341, 345. Dr. King assessed moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation, each of extended duration. Tr. at 348. Dr. King also completed a mental residual functional capacity assessment in which he indicated Plaintiff was moderately limited with respect to the following abilities: to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from

psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially-appropriate behavior; to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. Tr. at 352–53. He further indicated the following:

> [T]he cl demonstrates good tx response, and although he is currently tx for MDD with psych fx and paranoid personality traits, it is expected that within 12 months of onset he will be able to have the capacity to understand, remember, and carry out simple instructions. The cl will be able to attend to a simple task without special supervision. The cl will be able to maintain personal hygiene, and make simple work-related decisions. The cl will be able to work best with limited contact with the general public. The cl will be able to respond best to supportive supervision. The cl will be able to recognize and avoid normal workplace hazards, and use public transportation.

Tr. at 354.

On October 13, 2010, state agency medical consultant G. Hampton Smith, M.D., reviewed Plaintiff's medical records and determined he had no severe physical impairments. Tr. at 356.

Plaintiff followed up with Dr. Kulungowski on November 1, 2010. Tr. at 361–62. Dr. Kulungowski noted no abnormalities on Plaintiff's mental status examination. Tr. at 361. Plaintiff's diagnoses included psychotic disorder, NOS, and depressive disorder,

NOS. Tr. at 362. Dr. Kulungowski assessed a GAF score of 60 and noted Plaintiff had "no symptoms." *Id.* He recommended Plaintiff participate in outside activities, exercise, and stay in counseling. *Id.*

Plaintiff presented to Dr. Kulungowski for follow up on December 30, 2010. Tr. at 427–28. Plaintiff reported symptoms of depression and complained that Zoloft was too strong. Tr. at 428. Dr. Kulungowski indicated Plaintiff had not filled his prescription for Celexa. *Id.* Dr. Kulungowski instructed Plaintiff to remain on his medications and to continue with counseling. *Id.*

On January 6, 2011, Dr. Kulungowski indicated Plaintiff's prescription for Celexa was "problematic," and that he was replacing it with Remeron. Tr. at 426. Plaintiff denied suicidal and homicidal ideations and his mental status examination was normal. Tr. at 425. Dr. Kulungowski assessed a GAF score of 60. Tr. at 426.

Plaintiff followed up with Dr. Kulungowski on February 3, 2011. Tr. at 423–24. Plaintiff reported some tiredness from Remeron. Tr. at 424. He requested that his Invega dosage be decreased, but Dr. Kulungowski was reluctant to lower it. *Id.* Plaintiff's mental status examination was normal, and Dr. Kulungowski assessed a GAF score of 65. Tr. at 423–24.

On March 22, 2011, Plaintiff presented to Douglas R. Ritz, Ph. D. ("Dr. Ritz"), for a consultative mental status examination. Tr. at 363–66. Plaintiff reported depression, confusion, paranoid thoughts, and social withdrawal. Tr. at 363. He reported thoughts of self-harm, but no specific plan. *Id.* He indicated his medications made him "sleepy." *Id.* He described his mood as "kind of blank." *Id.* Plaintiff maintained eye contact with Dr.

Ritz and his speech was normal. Tr. at 364–65. His grooming and hygiene were good. Tr. at 365. His was calm, logical, coherent, alert, responsive, and in no distress. *Id.* His judgment was good. *Id.* His affect was flat and his insight was fair. *Id.* Plaintiff was able to perform serial threes, but he was unable to interpret a proverb. *Id.* His remote memory was good and he was able to remember three of four objects after a five-minute delay. *Id.* Dr. Ritz estimated Plaintiff's cognitive abilities to be average. *Id.* He indicated that Plaintiff "may be able to handle an unskilled type work setting." *Id.* He diagnosed major depressive disorder, single episode, moderate and psychotic disorder, NOS and assessed a GAF score of 55. *Id.*

Plaintiff presented to Chioma R. Ekechukwu, M.D. ("Dr. Ekechukwu") at Kershaw Mental Health, on March 31, 2011. Tr. at 421–22. He reported he was stable on his medication regimen. Tr. at 421. Dr. Ekechukwu assessed a GAF score of 60. Tr. at 422.

State agency consultant Gary E. Calhoun, Ph. D. ("Dr. Calhoun"), completed a psychiatric review technique on April 5, 2011, in which he considered Listing 12.03 for schizophrenic, paranoid, and other psychotic disorders, Listing 12.04 for affective disorders, and Listing 12.08 for personality disorders. Tr. at 369. He determined Plaintiff's impairments included psychotic disorder, NOS, major depressive disorder without psychotic features, moderate major depressive disorder (single episode), and paranoid personality traits. Tr. at 371, 372, 376. He assessed mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of

decompensation of extended duration. Tr. at 379. Dr. Calhoun indicated Plaintiff was moderately limited with respect to the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; and to interact appropriately with the general public. Tr. at 383–84. Dr. Calhoun indicated "[o]verall, claimant's symptoms and impairments are severe but would not preclude the performance of simple, repetitive work tasks in a setting that does not require on-going interaction with the public." Tr. at 385.

On April 9, 2011, Plaintiff attended a disability determination examination with Nicole Edwards, D.O. ("Dr. Edwards"). Tr. at 387–91. Plaintiff alleged psychosis, manic depression, hypertension, anemia, COPD, low back pain, and blacking out. Tr. at 387–88. He indicated he could sit and stand for unlimited periods, walk for 10 to 15 minutes at a time on level ground, and lift approximately 20 pounds. Tr. at 388. Plaintiff favored his left hip when he walked. Tr. at 389. He had reduced flexion of his lumbar spine to 80 degrees and bilateral knee crepitus. Tr. at 390. He had paresthesias on the left and low back pain with left straight-leg raise. *Id.* His left ankle was internally rotated five to 10 degrees at rest. *Id.* Plaintiff's physical examination was otherwise normal. Tr. at 389–90. Dr. Edwards indicated Plaintiff's "mentation was pleasant, but he did appear nervous." Tr. at 390. She further indicated Plaintiff bounced his legs and wrung his hands throughout the examination. *Id.* She indicated Plaintiff's "psychosis and manic depression" needed to be "further evaluated through a psychiatric exam to determine his functionality." *Id.* She indicated Plaintiff's hypertension, anemia, and COPD appeared to be controlled. *Id.* She indicated he had some abnormalities due to low back pain, but that

they did not appear to be functionally limiting. *Id.* She found no neurological explanation for Plaintiff's blackouts. *Id.*

Plaintiff presented to Dr. Hunt for a medication refill on April 11, 2011. Tr. at 397. He reported pain that was a seven out of 10. *Id.* His oxygen saturation was 96 percent. *Id.* Dr. Hunt indicated diagnoses of hypertension and bipolar disorder. *Id.*

On April 29, 2011, state agency medical consultant Hugh Clarke, M.D., completed a physical residual functional capacity assessment in which he indicated Plaintiff was limited to occasionally lifting and/or carrying 50 pounds; frequently lifting and/or carrying 25 pounds; standing and/or walking about six hours in an eight-hour workday; sitting for about six hours in an eight-hour workday; pushing and/or pulling without limit; occasionally climbing ramps/stairs; never climbing ladders/ropes/scaffolds; and avoiding concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. Tr. at 399–406.

Plaintiff followed up with Dr. Ekechukwu on May 24, 2011. Tr. at 419–20. He reported increased emotional bluntedness with an increased dosage of Invega. Tr. at 419. He endorsed depressed mood, and Dr. Ekechukwu indicated she was reluctant to decrease Plaintiff's dosage of Invega without first prescribing an antidepressant. *Id.* Dr. Ekechukwu assessed a GAF score of 56. Tr. at 420.

Plaintiff followed up with Dr. Ekechukwu on July 5, 2011. Tr. at 416–17. Plaintiff's target symptoms for treatment included anxiety, delusions/paranoia, and legal problems. Tr. at 416. Plaintiff reported increased swelling and blurred vision since starting Wellbutrin SR. *Id.* He also reported residual paranoia. *Id.* Dr. Ekechukwu noted

Plaintiff "seems particularly sensitive to side effects" of medications. *Id.* Plaintiff decided to remain on Wellbutrin SR despite its side effects because it had a positive effect on his depressive symptoms. *Id.* However, Plaintiff complained that Invega caused him to be emotionally blunted. *Id.* Dr. Ekechukwu prescribed a trial dose of Fanapt to target paranoia. *Id.*

Plaintiff followed up with Dr. Ekechukwu on September 13, 2011. Tr. at 414–15. His target symptoms for treatment included anxiety and delusions/paranoia. Tr. at 414. Plaintiff reported a negative reaction to Geodon. *Id.* He reported residual paranoia, but stated that he could cope with it. *Id.* Dr. Ekechukwu decribed Plaintiff's judgment and insight as fair. *Id.* She noted that Plaintiff was taking his medication, keeping his appointments, and acknowledged his illness and need for medication. *Id.* Dr. Ekechukwu indicated diagnoses of psychotic disorder, NOS and depressive disorder, NOS. Tr. at 415. She assessed a GAF score of 55 and discontinued Geodon. *Id.*

Plaintiff presented to Pamela Wood, APRN ("Ms. Wood"), at Kershaw Mental Health on October 25, 2011. Tr. at 412–13. He reported delusions and moderate-to-severe depression despite compliance with medications. Tr. at 412. He indicated he did not want his dosage of Invega increased because it made his mind feel blank. *Id.* He reported a 40-pound weight gain, which Ms. Wood indicated was possibly caused by Remeron. *Id.* Ms. Wood increased Plaintiff's Wellbutrin SR dosage to 300 mg. Tr. at 413.

Plaintiff followed up with Ms. Wood on November 28, 2011. Tr. at 410–11. His target symptoms for treatment included anxiety, delusions/paranoia, depression, legal problems, and sleep/appetite disturbance. Tr. at 410. He reported intermittent and

moderate depression, weird and paranoid thoughts, and moderate anxiety. *Id.* Ms. Wood decreased Plaintiff's Wellbutrin SR dosage to 150 mg and noted that he developed a headache that lasted for two weeks while taking the higher dose. *Id.* She also prescribed Zoloft and diagnosed schizophrenia, paranoid type, and depressive disorder, NOS. Tr. at 410, 411. She assessed a GAF score of 60. *Id.*

On January 13, 2012, Plaintiff presented to Donald W. Morgan, M.D., at Kershaw Mental Health. Tr. at 408–09. His target symptoms for treatment included anxiety, delusions/paranoia, depression, legal problems, and sleep/appetite disturbance. Tr. at 408. Dr. Morgan noted Plaintiff was taking Invega 9 mg and Wellbutrin SR 150 mg and that he was doing well with good sleep and appetite. *Id.* He reported no side effects to his medications. *Id.* Dr. Morgan assessed schizophrenia, paranoid type and depressive disorder, NOS. *Id.* He indicated Plaintiff's GAF score to be 70. Tr. at 409.

Plaintiff followed up with Dr. Hotchkiss on February 13, 2012. Tr. at 451–53. He reported rarely taking Remeron and taking Vistaril a couple of times per week for anxiety. Tr. at 451. Plaintiff reported stable mood and denied excessive sedation and major irritability, but endorsed mild paranoia. *Id.* Dr. Hotchkiss assessed a GAF score of 60. Tr. at 452.

On March 26, 2012, Plaintiff followed up with Dr. Hotchkiss. Tr. at 454–56. Plaintiff reported that he saw his children monthly and went to a friend's garage, but that he was uncomfortable in social settings. Tr. at 454. He reported stable mood and denied sleep and appetite disturbance, suicidal ideations, and homicidal ideations. *Id.* He denied gross mania, hallucinations, and delusions, but endorsed a "little paranoia" and "slight

13

hypervigilance." *Id.* He indicated he only used Remeron as needed and stated he had not used Vistaril "much." *Id.* Dr. Hotchkiss assessed a GAF score of 60. Tr. at 455.

Kelli Barnes, LPC ("Ms. Barnes"), wrote a letter on March 26, 2012, indicating Plaintiff's diagnoses included schizophrenia, paranoid type and depressive disorder, NOS. Tr. at 437. Ms. Barnes wrote that Plaintiff reported depressed mood, anxiety attacks, sleep disturbance, poor energy and concentration, confusion, persecutory delusions, and paranoia. *Id.* Ms. Barnes indicated "[t]he symptoms reported are, at times, sufficiently severe that his daily life is adversely affected in various ways." *Id.* She further indicated that Plaintiff had delusions toward his family members and was aggressive with them, that he experienced mild paranoia, that he was confused in the mornings and unable to concentrate on tasks, and that he had a history of wandering when unstable. *Id.*

Plaintiff followed up with Dr. Hotchkiss on May 15, 2012. Tr. at 457–59. He reported only rarely taking Remeron and Vistaril. Tr. at 457. He denied gross mania, suicidal ideations, homicidal ideations, sustained depression, and sleep disturbance. *Id.* He endorsed occasional strange thoughts and some sense of hypervigilance. *Id.* Plaintiff's insight was described as "fair," but his mental status examination was otherwise normal. Tr. at 457–58. Dr. Hotchkiss assessed a GAF score of 61. Tr. at 458.

Plaintiff again followed up with Dr. Hotchkiss on July 10, 2012. Tr. at 460–62. He reported being depressed and feeling "so-so." Tr. at 460. He indicated that he could not think straight at times, had occasional racing thoughts, and obsessed about the past. *Id.* He denied suicidal or homicidal ideation, gross mania, hallucinations, delusions,

paranoia, and hypervigilance. *Id.* He reported compliance with medications and denied excess sedation. *Id.* Dr. Hotchkiss assessed a GAF score of 60. Tr. at 461.

Plaintiff saw Dr. Hotchkiss on September 6, 2012, and reported good sleep and good appetite. Tr. at 463. He indicated he experienced occasional depression when he focused on the past and that he was not very active. *Id.* Dr. Hotchkiss indicated Plaintiff had fair insight, but the mental status examination was otherwise normal. Tr. at 464. He assessed Plaintiff's GAF score to be 59. *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on November 8, 2012, Plaintiff testified he lived in an apartment behind his parents' home. Tr. at 46. He stated he was 5' 11" tall and weighed approximately 190 pounds. *Id.* He indicated he was right handed. *Id.* He testified he had a driver's license, but had not driven since he was hospitalized. Tr. at 46–47. Plaintiff stated that he did not smoke, drink, or use any drugs other than his prescribed medications. Tr. at 47.

Plaintiff testified that his past work as a service person required him to inspect farms to determine the health of birds. Tr. at 48. He stated that he stopped working in 2007, but did not collect unemployment compensation. *Id.* Plaintiff testified that he was fired because of his health problems. Tr. at 52.

He stated he had schizophrenia and depression and that he experienced confusion and difficulty focusing. *Id.* Plaintiff testified that he took medication before he was fired

15

from his job, but the medication did not work well. Tr. at 52–53. He testified that he stopped taking medication prior to his hospitalization in February 2010, but had taken medications since he was discharged. Tr. at 53. He stated that his hallucinations and delusions decreased with use of the medication. Tr. at 53–54. Plaintiff indicated that his medications were changed during his second hospitalization. Tr. at 54. He confirmed that he began treatment with Ms. Barnes at the mental health center after the second hospitalization. Tr. at 55. Plaintiff testified that on approximately eight to 10 days per month, he experienced difficulty focusing, confusion, and strange thoughts that caused him to be unable to do anything. Tr. at 55–56, 57. He stated that he experienced panic attacks without warning that sometimes lasted for an entire day. Tr. at 58. He indicated that he still heard voices and experienced visual hallucinations "at times." Tr. at 61.

Plaintiff testified he had back problems and problems with his hip, but could not afford treatment. Tr. at 61, 62. He stated he took medication for high blood pressure that controlled his symptoms. Tr. at 61.

Plaintiff testified that his medications caused him to feel "drugged" and sleepy for most of the day. Tr. at 56. He indicated he experienced dizziness and occasional blurred vision. *Id.* He stated he had difficulty concentrating and focusing, but that he did not know if those symptoms were related to his impairments or the medications. *Id.* Plaintiff stated that he informed his doctors of the side effects, but that efforts to change his medications had been unsuccessful. Tr. at 57.

Plaintiff testified that he generally awoke around 7:00 a.m. and had breakfast with his parents. Tr. at 49. He stated his parents prepared the food. *Id.* He indicated he rode to

the store with his father to drink coffee two to three times per week. *Id.* He stated he returned home, watched television, and napped for about an hour-and-a-half on most mornings. Tr. at 49, 60. *Id.* He testified he ate lunch with his parents and typically slept for another hour-and-a-half in the afternoon. Tr. at 49, 60. He indicated he ate dinner with his parents around 7:00 p.m. on nights when he ate dinner. Tr. at 50. He testified he typically went to bed around 9:00 p.m. *Id.* He indicated he took additional medication when he had difficulty sleeping. Tr. at 59–60. He stated he slept for 10 to 12 hours most nights, but awoke feeling "drugged out." Tr. at 60.

Plaintiff testified he cleaned his apartment with his mother's assistance. Tr. at 50. He indicated he swept the floor, washed some dishes, and did some laundry approximately every week-and-a-half. *Id.* He testified he shopped for groceries with his mother approximately twice a month. Tr. at 50–51. He stated that he attended the church where his mother was the pianist approximately once every three months. Tr. at 51. Plaintiff testified that he ate in restaurants with his parents once every week or two. *Id.* He indicated he had a dog, but that his father typically cared for it. *Id.* Plaintiff indicated that he typically remembered to take his medications, but that his mother checked behind him. Tr. at 59.

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Celena Earl reviewed the record and testified at the hearing. Tr. at 63–69. The VE categorized Plaintiff's PRW as an agricultural commodities inspector, *Dictionary of Occupational Titles* ("*DOT*") number 168.287-010, as light with a specific vocational preparation ("SVP") of seven. Tr. at 64. The ALJ

17

described a hypothetical individual of Plaintiff's vocational profile who could lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; frequently balance, stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to extreme heat, fumes, odors, dust, gas, poor ventilation, and hazards. Tr. at 64. The ALJ further indicated the individual would be limited to unskilled work and/or routine repetitive tasks with no interaction with the public and no production-pace work (i.e., assembly line), but could perform goal-oriented work (i.e., office cleaner). Tr. at 64–65. The VE testified that the hypothetical individual could not perform Plaintiff's PRW. Tr. at 65. The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. *Id.* The VE identified jobs as an auto cleaner, *DOT* number 919.687-014, as medium with an SVP of one with 2,586 positions in South Carolina and 195,998 positions in the United States; an industrial cleaner, *DOT* number 381.687-018, as medium with a SVP of two with 11,470 positions in South Carolina and 1,077,761 positions in the United States; and a store laborer, *DOT* number 922.687-058, as medium with a SVP of two with 1,363 positions in South Carolina and 86,706 positions in the United States. *Id.* The ALJ next asked the VE to assume a hypothetical individual of Plaintiff's vocational profile who could lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, frequently balance,

stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to extreme heat, fumes, odors, dust, gas, poor ventilation, and hazards. Tr. at 65–66. The ALJ further limited the individual to unskilled work and/or routine, repetitive tasks with no interaction with the public and stated the individual could not maintain concentration, persistence, and pace to complete an eight-hour workday and 40-hour workweek. Tr. at 66. The ALJ asked if the individual would be able to perform any work available in the local or national economy. *Id.* The VE testified that the individual could perform no work. *Id.* The ALJ then asked the VE to assume a hypothetical individual with Plaintiff's vocational profile who was limited as stated in Plaintiff's testimony, considering all testimony to be credible. *Id.* She asked the VE if the individual could perform any work. Tr. at 66–67. The VE testified that the individual would be able to perform no work. Tr. at 67.

Plaintiff's attorney asked the VE to assume the same limitations as provided in the first hypothetical, but to assume that the individual would have to nap for at least one hour per day because of side effects from medications taken to control schizophrenia. Tr. at 67–68. Plaintiff's attorney asked if there would be any work available that would accommodate such a requirement. Tr. at 68. The VE testified that limitation would eliminate all jobs. *Id.* Plaintiff's attorney then asked the VE to assume the same limitations in the ALJ's first hypothetical, but to assume that the individual would experience at least one panic attack per week that required him to be away from work for half of a day. *Id.* Plaintiff's attorney asked if there would be any work available to that individual. *Id.* The VE testified that there would be no work. *Id.* Finally, Plaintiff's

attorney asked the VE to assume that hypothetical individual suffered from confusion to the degree that he would not be able to focus on work for at least one hour out of an eight-hour day. *Id.* He asked if any work would be available to that individual. *Id.* The VE testified that no work would be available. Tr. at 69.

2.    The ALJ's Findings

In her decision dated December 7, 2012, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.    The claimant has not engaged in substantial gainful activity since February 1, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)

3.    The claimant has the following severe impairments: disorders of the back, chronic obstructive pulmonary disease, blackouts, psychotic disorder, major depressive disorder with psychotic features, and paranoid personality traits (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(c), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c). Claimant can lift and/or carry 50 pounds occasionally and 25 pounds frequently, stand and/or walk about 6 hours in an 8 hour workday, and sit about 6 hours in an 8 hour workday. Claimant can occasionally climb ramps and stairs, never climb, ladders, ropes, and scaffolds, and frequently balance, stoop, kneel, crouch, and crawl. Claimant should avoid concentrated exposure to extreme heat, hazards, fumes, odors, dusts, gases, and poor ventilation. Claimant is limited to performing routine, repetitive tasks and/or unskilled work with no public interaction. Claimant cannot perform work requiring a production pace such as work on an assembly line, but can do goal oriented work such as work as an office cleaner.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on April 9, 1964 and was 45 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 24–35.

D.    Appeals Council Review

The Appeals Council denied Plaintiff's request for review in a notice dated January 23, 2015. Tr. at 5–9. The Appeals Council indicated it considered new evidence submitted by Plaintiff, which included medical reports from South Carolina Radiology, Florence MRI and Imaging, and a physician's statement completed by Dr. Hunt for the South Carolina Department of Social Services. Tr. at 6. However, the Appeals Council concluded that the new information was about a later time and did not affect the decision about whether Plaintiff was disabled beginning on or before December 7, 2012. *Id.*

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ improperly assessed and failed to explain her findings regarding Plaintiff's RFC;

21

2)      the ALJ failed to consider the entire record in assessing Plaintiff's credibility; and

3)      the ALJ improperly considered the medical opinion evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed

impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the

---

impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must

24

carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    RFC Assessment

Plaintiff argues the ALJ failed to properly assess his RFC based on the requirements in SSRs 96-8p and 85-15 and Fourth Circuit precedent. [ECF No. 26 at 3–4]. The Commissioner maintains that the ALJ properly assessed Plaintiff's RFC based on the evidence in the record. [ECF No. 28 at 12–14].

RFC is an assessment of the claimant's ability to perform sustained work-related activities eight hours per day, five days per week. SSR 96-8p. The ALJ must identify the limitations imposed by the claimant's impairments and assess his work-related abilities on a function-by-function basis. *Id.* "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.*

The RFC assessment must be based on all of the relevant evidence in the case record, which includes medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical

source statements, effects of symptoms that are reasonably attributed to the medically-determinable impairment, evidence from attempts to work, need for structured living environment, and work evaluations. *Id.*

In cases in which a claimant's impairment does not meet or equal a Listing, but the individual is unable to meet the mental demands of PRW, the ALJ must consider his occupational base, age, education, and work experience to determine if he can do other work considering his remaining mental capacities. SSR 85-15. Failure to meet or equal a listed mental impairment does not necessarily equate with a capacity to perform unskilled work, and the ALJ must carefully assess the claimant's RFC based on the "[t]he basic mental demands of competitive, remunerative, unskilled work," which "include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Id.* If the claimant has substantially lost the ability to meet any basic mental demands, a finding that the claimant is disabled is supported by a severe reduction in the potential occupational base. *Id.*

The ability of an individual with a mental illness to function outside of a work environment does not necessarily reflect that individual's ability to function in the workplace. *See id.* According to SSR 85-15:

> Individuals with mental disorders often adopt a highly restricted and/or inflexible lifestyle within which they appear to function well. Good mental health services and care may enable chronic patients to function adequately in the community by lowering psychological pressures, by medication, and by support from services such as outpatient facilities, day care programs, social work programs and similar assistance.

The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day…. Thus, the mentally impaired may have difficulty meeting the requirement of even so-called "low stress" jobs.

*Id.*

In light of the foregoing authorities, the court considers the specific issues raised by Plaintiff regarding the ALJ's RFC assessment.

a.     Consideration of the Entire Record

Plaintiff argues the ALJ incorrectly determined his RFC and neglected to support her conclusions. [ECF No. 26 at 3]. He maintains the ALJ failed to consider all of his psychiatric treatment notes together and instead supported her conclusion by isolating a few notes in which his symptoms had improved. *Id.* at 4. Plaintiff cites the Fourth Circuit's decisions in *Totten v. Califano*, 624 F.2d 10 (4th Cir. 1980), and *Kellough v. Heckler*, 785 F.2d 1147 (4th Cir. 1986), to argue that the ALJ was required to consider the entire record. *Id.*

The Commissioner maintains the ALJ considered "all of the relevant medical and non-medical evidence" in assessing Plaintiff's RFC. [ECF No. 28 at 14].

The Fourth Circuit's decisions in *Totten* and *Kellough* emphasize that ALJs are required to look beyond specific treatment notes for evidence of a claimant's general functional ability. In *Totten*, the Fourth Circuit remanded the case where the ALJ failed to consider whether the plaintiff's well-documented, sporadic periods of incapacity prevented her from performing substantial gainful activity within the meaning of the Act.

624 F.2d at 12. The court stated "[t]he 'continuous period' language of § 423(d)(1)(A) does not require a claimant to show an inability to engage in any substantial gainful activity every day of his existence." *Id.* at 11. In *Kellough*, the court found that "isolated references in the physician's notes to 'feeling well' and 'normal activity'" did not provide a substantial basis for disregarding the plaintiff's subjective complaints. 785 F.2d at 1153. Although the court was directly addressing credibility, as opposed to the RFC assessment, the undersigned notes the court's emphasis on the requirement for the Commissioner to avoid relying on statements without examining the context of those statements.

In the case at hand, the ALJ wrote the following:

Specifically, claimant alleged he did not handle stress well, experienced confusion, felt anxious and depressed around others, and had problems with focus and memory, and I have limited claimant to performing unskilled work with no public interaction or production pace. However, I note claimant reported he shopped, attended church, spent time with friends and family, and did simple household chores, examinations generally showed intact attention and memory, and treatment notes from 2011 and 2012 describe claimant's condition as generally stable.

Claimant also reported panic attacks lasting up to an entire day. However, treatment notes do not reveal repeated complaints of panic attacks, claimant was not diagnosed with a panic disorder, and the record reveals no emergent treatment for panic attacks. Moreover, though claimant reported hallucinations, examinations generally revealed intact cognition and thought processes (Exhibits 17F and 23F), and recent treatment notes report no hallucinations (Exhibits 23F, 24F, and 25F).

Tr. at 31.

The undersigned finds that the ALJ neglected to consider all the relevant evidence in the case record in assessing Plaintiff's RFC. Plaintiff's treatment notes revealed persistent symptoms related to his mental impairments, including nervousness, social

anxiety, emotional bluntedness, depressed mood, residual paranoia, delusions, hypervigilance, and obsessive and racing thoughts. On April 9, 2011, Dr. Edwards noted that Plaintiff appeared nervous, bounced his legs, and wrung his hands throughout the examination. Tr. at 390. On May 24, 2011, Plaintiff complained of emotional bluntedness and depressed mood. Tr. at 419. He reported residual paranoia and emotional bluntedness on July 5, 2011. Tr. at 416. On September 13, 2011, he complained of residual paranoid, but stated he was "able to cope." Tr. at 414. Plaintiff reported delusions, moderate to severe depression, and blank mind on October 25, 2011. Tr. at 412. On November 28, 2011, he complained of intermittent and moderate depression, weird and paranoid thoughts, and moderate anxiety. Tr. at 410. In February 2012, Plaintiff reported mild paranoia. Tr. at 451. On March 26, 2012, he complained of discomfort in social settings, paranoia, and hypervigilance. Tr. at 454. On that same date, Ms. Barnes indicated Plaintiff's symptoms included depressed mood, anxiety attacks, sleep disturbance, poor energy, confusion, poor concentration, persecutory delusions, and paranoia. Tr. at 437. Plaintiff endorsed occasional strange thoughts and hypervigilance on May 15, 2012. Tr. at 457. On July 10, 2012, he reported depression, occasional racing thoughts, and obsession about the past. Tr. at 460. On September 6, 2012, Plaintiff indicated he was not very active and experienced occasional depression when he focused on the past. Tr. at 463. The ALJ relied on treatment notes that indicated stable condition and intact cognition and thought processes at the time of examination, but excluded evidence of Plaintiff's symptoms between treatment visits and his functioning outside the treatment

environment. This evidence indicated more prevalent symptoms than were considered in the ALJ's RFC assessment.

The undersigned further finds that the ALJ did not adequately consider whether Plaintiff maintained the ability to meet the basic mental demands of unskilled work as discussed in SSR 85-15. The ALJ neglected to look outside of Plaintiff's treatment notes at evidence that suggested Plaintiff was doing well because he had adopted a highly-restricted daily routine. *See* Tr. at 49–51 (Plaintiff testified that he lived in an apartment behind his parents' home; parents prepared most of his meals; he napped for extended periods in each morning and afternoon; his mother assisted with cleaning, confirmed that he took his medications, and accompanied him to the grocery store twice a month; his father provided transportation and went with him to get coffee at a store two or three times per week); *see also* Tr. at 218–25, 230–34, 236–43, 274–76 (reported activities in disability and function reports consistent with Plaintiff's testimony), 364 (Plaintiff's description of his daily activities to Dr. Ritz were consistent with the disability and function reports and his testimony). As indicated by SSR 85-15, an individual's ability to function within a highly-restrictive lifestyle is not necessarily indicative of his ability to function in a work environment. The ALJ also failed to consider evidence that suggested periods of symptom exacerbation that further reduced Plaintiff's ability to function on some days as opposed to others. *See* Tr. at 55–56, 57 (Plaintiff testified that on approximately eight to 10 days per month, he experienced difficulty focusing, confusion, and strange thoughts that caused him to be unable to do anything), 410 (Plaintiff indicated to Ms. Wood that he experienced intermittent depression, weird and paranoid

thoughts, and anxiety), 437 (Ms. Barnes indicated Plaintiff's symptoms were severe enough, at times, to adversely affect his daily life), 451 (Plaintiff reported to Dr. Hotchkiss that he was taking Vistaril a couple of times per week for anxiety), 457 (Plaintiff reported occasional strange thoughts and hypervigilance), 460 (Plaintiff complained to Dr. Hotchkiss that he could not think straight at times and had occasional racing thoughts). In light of the foregoing, the undersigned finds that the ALJ failed to consider whether Plaintiff's ability to function in a controlled environment appropriately reflected his ability to function outside of it and whether he could meet basic mental demands in a work setting over the course of an eight-hour workday and 40-hour workweek.

### b.     Hospitalizations

Plaintiff maintains the ALJ did not adequately consider his psychiatric hospitalizations or the abnormalities noted by Dr. Ritz, Dr. Kulungowski, and other providers. [ECF No. 26 at 4]. The Commissioner argues that the ALJ considered Plaintiff's hospitalizations, but concluded that his condition improved and stabilized with consistent treatment. [ECF No. 28 at 14–20].

The ALJ indicated the following regarding Plaintiff's hospitalizations: "Claimant was hospitalized for about a month beginning in February 2010 due to depression and possible paranoia (Exhibit 2F, examination in May 2010 showed anxious mood, agitated affect, and pressured speech (Exhibit 3F/3), and claimant was hospitalized for about 2 months beginning in June 2010 due to altered mental status (Exhibit 4F)." Tr. at 29. She further indicated that Dr. Heath "reported claimant demonstrated improved affect, good

31

mood, no paranoia, and logical thinking after taking Seroquel reliably during hospitalization in February 2010 (Exhibit 2F/5)." Tr. at 30.

The undersigned finds that the ALJ did not adequately consider Plaintiff's hospitalizations in assessing his RFC. The ALJ mentioned the hospitalizations and concluded that Plaintiff's impairments improved after discharge, but she did not discuss particular details of the hospitalizations or their implications. Plaintiff was hospitalized on two occasions for a combined total of nearly 13 weeks in 2010. *See* Tr. at 287–89, 313. The treatment notes from these hospitalizations are particularly relevant because they indicate difficulty finding a medication regimen that adequately addressed Plaintiff's symptoms. *See* Tr. at 292–93, 314–16. The records also indicated Plaintiff experienced persistent symptoms while in a controlled environment with regular medication monitoring and administration. *See id.* Furthermore, the ALJ neglected to assess indications from other treatment providers that suggested persistent symptoms after Plaintiff's hospitalizations. Because the ALJ failed to adequately consider the records from Plaintiff's hospitalizations and subsequent outpatient treatment, the undersigned finds the RFC she assessed was not based upon the entire record.

c.    GAF Scores

Finally, Plaintiff maintains the ALJ improperly relied on GAF scores to support her conclusion. [ECF No. 26 at 10]. The Commissioner argues the ALJ was required to assess the GAF scores as opinion evidence. [ECF No. 28 at 14].

The ALJ indicated the following regarding Plaintiff's GAF scores:

I have also given significant weight to the various Global Assessment of Functioning scores reported in treatment notes from state mental health

centers (Exhibits 5F, 9F, 17F, 23F, 24F, and 25F). Such scores only provide a snapshot of claimant's condition at any given time. However, such are consistent with mental health treatment notes and examinations, which indicate claimant's condition improved and stabilized with consistent treatment. Moreover, scores from the end of 2010 through September 2012 indicate claimant had largely mild to moderate symptoms or related decrease in functioning, which is consistent with the assessments of Dr. Calhoun and Dr. King, as well as Dr. Ritz's opinions.

Tr. at 32.

The American Psychiatric Association ("APA") recognized the GAF scale as a means of tracking clinical progress of individuals with respect to psychological, social, and occupational functioning. *DSM-IV-TR*" at 32. However, the APA dispensed with use of the GAF scale in the Fifth Edition of the *Diagnostic & Statistical Manual of Mental Disorders* ("*DSM-V*") for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *DSM-V* at 16. The *DSM-V* instead uses the World Health Organization's Disability Assessment Schedule ("WHODAS") to provide a global measure of disability. This court has previously held that without additional context, a GAF score is not meaningful. *See Parker v. Astrue*, 664 F. Supp. 2d 544, 557 (D.S.C. 2009) (stating that "Plaintiff's GAF score is only a snapshot in time, and not indicative of Plaintiff's long term level of functioning.").

The undersigned finds that the ALJ placed improper emphasis on Plaintiff's GAF scores to the exclusion of specific evidence regarding Plaintiff's symptoms and level of disability. The undersigned agrees with the Commissioner's argument that GAF scores represent opinion evidence that the ALJ should consider. However, in light of the psychiatric community's rejection of the GAF scale as an adequate means of assessment

and this court's requirement that ALJ's look beyond GAF scores, the undersigned finds that the ALJ accorded greater weight to Plaintiff's GAF scores than was warranted by the record. The ALJ gave significant weight to GAF scores that conflicted with other evidence regarding Plaintiff's global functioning, including treatment notes that documented more severe symptoms and descriptions of daily activities that suggested greater disability.[5] Therefore, the undersigned that the ALJ erred in relying on Plaintiff's GAF scores to support the assessed RFC.

### d.    Inclusion of Additional Restrictions in RFC

Plaintiff argues the ALJ failed to comply with the requirements of SSRs 85-15 and 96-8p because she neglected to explain how Plaintiff's psychiatric impairments were accommodated by the assessed RFC. *Id.* at 8–9. The Commissioner argues that additional limitations were not supported by the record. [ECF No. 28 at 15].

The ALJ indicated that Plaintiff's mental impairments restricted him to "performing routine, repetitive tasks and/or unskilled work with no public interaction" and that he could not "perform work requiring a production pace such as work on an assembly line." Tr. at 28. The ALJ further found that Plaintiff could perform "goal oriented work such as work as an office cleaner." *Id.* She further restricted Plaintiff "from all public interaction and from performing work with a production pace" given his

[5] The undersigned acknowledges that the ALJ rendered her opinion before the *DSM-V* was published and is not suggesting that she should have anticipated that the APA would reject the GAF scale. However, the undersigned believes that this court's decision in *Parker* emphasizes the APA's reasons for finding the GAF scale to be an inaccurate indicator of mental functioning and is consistent with the APA's decision to abandon use of the GAF scale.

"history of paranoia and depression and allegations of problems handling stress, maintaining focus, and being around others." Tr. at 32.

Although the ALJ indicated that restricting Plaintiff from public interaction and production-pace addressed his paranoia, depression and problems handling stress, concentrating, and being around others, the ALJ did not adequately explain how she accommodated all of Plaintiff's symptoms or how the restrictions that she imposed addressed the symptoms that she purported to address. Therefore, upon remand, the ALJ should reconsider whether the restrictions she imposed adequately addressed the cited symptoms and whether Plaintiff's additional symptoms warrant the imposition of additional restrictions.

### 2.     Credibility Assessment

Plaintiff argues the ALJ failed to follow the requirements of SSR 96-7p and Fourth Circuit precedent in evaluating his credibility. [ECF No. 26 at 10–12]. The Commissioner argues that the ALJ explained why she found Plaintiff's statements to not be credible. [ECF No. 28 at 13].

After a claimant has established the existence of a medically-determinable impairment, the ALJ should consider the intensity, persistence, and functionally-limiting effects of his symptoms to determine the extent to which they affect the claimant's ability to do basic work activities. SSR 96-7p. "[T]he adjudicator must carefully consider the individual's statement about symptoms with the rest of the relevant evidence in the case record" in determining whether the claimant's statements are credible. *Id.* To assess the credibility of the claimant's statements, the ALJ "must consider the entire case record,

including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* The ALJ cannot disregard the claimant's statements about symptoms merely because they are not substantiated by objective medical evidence. *Id.* Furthermore, the ALJ must specify his reasons for the finding on credibility, and his reasons must be supported by the evidence in the case record. *Id.* The ALJ's decision must clearly indicate the weight accorded to the claimant's statements and the reasons for that weight. *Id.*

The ALJ should consider the following factors in addition to the objective medical evidence in assessing the credibility of a claimant's statements: (1) the individual's daily activities; (2) the location, duration, frequency and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 or 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *Id.* (*citing* 20 CFR §§ 404.1529(c) and 416.929(c)).

In light of the foregoing authorities, the court considers the specific issues raised by Plaintiff regarding the ALJ's credibility assessment.

a.    Daily Activities

Plaintiff maintains the ALJ considered the activities he performed without considering the infrequency of those activities and his unreliability in performing them. [ECF No. 26 at 12–15].

The ALJ indicated that she considered Plaintiff's reports that he performed self-care, prepared simple meals, went out alone, shopped, spent time with family and a neighbor, did laundry, walked several times per day, performed yardwork, swept, mopped, vacuumed, washed dishes, went fishing, went out to eat, and attended church occasionally. Tr. at 30.

The undersigned finds that the ALJ failed to properly consider Plaintiff's daily activities in assessing his credibility. Although Plaintiff indicated that he performed the activities cited by the ALJ, he also indicated that he was unable to function for eight to 10 days per month, required his mother's assistance to perform chores and shopping, generally ate the meals that his parents prepared, did not drive, and napped for an hour-and-a-half twice daily. Tr. at 49–51, 57. The Fourth Circuit's decisions in *Totten* and *Kellough* emphasize that ALJ's should not take information out of context and should instead consider the claimant's general functional ability. *See Totten*, 624 F.2d at 12; *Kellough*, 785 F.2d at 1153. The undersigned finds that the ALJ improperly relied on some of Plaintiff's reported daily activities, but did not consider Plaintiff's limitations in performing those activities or provide a substantial basis for disregarding other daily

activities that suggested he would have difficulty functioning in the workplace. Thus, the ALJ neglected to consider the implications of Plaintiff's daily activities on his general functional ability.

b.     Side Effects of Medications

Plaintiff contends the ALJ erroneously stated he had no side effects from his medications and neglected to consider the side effects documented in the record. *Id.* at 16.

The ALJ indicated that she considered Plaintiff's "alleged drowsiness and dizziness due to medication," but "included no related limitations" because [t]reatment notes from May and July 2012 report claimant denied sedation and other side effects from medication (Exhibit 23F, 81 Exhibit 24F/1), and examinations showed claimant was alert and oriented (Exhibits 17F and 23F)." Tr. at 31.

Plaintiff's records indicate significant struggles to regulate his medications due to multiple side effects and general ineffectiveness. During his hospitalization from January 30 to March 2, 2010, Plaintiff was initially prescribed Seroquel, but he reported that it made him feel sedated and lightheaded. Tr. at 293. He was given 20 mg of Celexa, but he continued to have disorganized and tangential thoughts. *Id.* Plaintiff was then prescribed Haldol and reported improvement, but developed a slight hand tremor. *Id.* He was again prescribed Seroquel prior to discharge. *Id.* During the second hospitalization, Plaintiff was initially prescribed Prolixin, which was gradually titrated to a higher dosage. Tr. at 314. He again developed a tremor. *Id.* His Prolixin dosage was decreased after he complained of daytime sedation. Tr. at 314. However, the dosage was ineffective to

control his symptoms, so it was later increased. *Id.* His tremor again worsened and Prolixin was again decreased and Invega was prescribed. Tr. at 315. On December 30, 2010, Plaintiff complained that Zoloft was too strong. Tr. at 428. On January 6, 2011, Dr. Kulungowski indicated Plaintiff's prescription for Celexa was "problematic" and he replaced it with Remeron. Tr. at 426. Plaintiff completed an adult function report on January 10, 2011, in which he indicated he experienced drowsiness and dizziness as side effects of medication use. Tr. at 243. On February 3, 2011, Plaintiff reported some tiredness from Remeron and requested that his Invega dosage be decreased. Tr. at 424. During the consultative examination on March 22, 2011, Plaintiff indicated to Dr. Ritz that his medications made him sleepy. Tr. at 364. On May 24, 2011, Plaintiff complained of increased emotional bluntedness with the increased dosage of Invega. Tr. at 419. In July 2011, Plaintiff complained of increased swelling and blurred vision since starting Wellbutrin. Tr. at 416. Dr. Ekechukwu noted Plaintiff seemed "particularly sensitive to side effects" of medications. *Id.* Plaintiff decided to remain on Wellbutrin SR despite its side effects because it had a positive effect on his depressive symptoms. *Id.* However, he complained that Invega caused him to be emotionally blunted. *Id.* Dr. Ekechukwu prescribed a trial dose of Fanapt to target paranoia, and Plaintiff was instructed to follow up with the nurse in two weeks regarding its effectiveness. *Id.* Although the record does not reflect Plaintiff's follow up with the nurse, the undersigned notes that Plaintiff was not taking Fanapt at his next visit and was instead taking Geodon. Tr. at 414. On September 13, 2011, Plaintiff reported a negative reaction to Geodon and Dr. Ekechukwu discontinued the prescription. Tr. at 414, 415. On October 25, 2011, Plaintiff reported

39

delusions and moderate-to-severe depression despite compliance with medications. Tr. at 412. Ms. Wood increased Plaintiff's Wellbutrin SR dosage to 300 mg. Tr. at 413. On November 28, 2011, Ms. Wood noted that Plaintiff developed a headache that lasted for two weeks while taking the increased dosage of Wellbutrin and reduced the dosage to 150 mg daily and prescribed Zoloft. Tr. at 410. On February 13, 2012, Plaintiff reported rarely taking Remeron and taking Vistaril a couple of times per week for anxiety. Tr. at 451. He was taking Wellbutrin SR and Invega as prescribed. *Id.* Plaintiff reported stable mood and denied excess sedation and major irritability, but reported mild paranoia. *Id.* In March 2012, Plaintiff reported that he only used Remeron as needed and stated he had not used Vistaril "much." Tr. at 454. He denied gross mania, hallucinations, and delusions, but endorsed "little paranoia" and "slight hypervigilance." *Id.* On May 15, 2012, Plaintiff reported only rarely taking Remeron and Vistaril. Tr. at 457. He denied gross mania, suicidal ideations, homicidal ideations, sustained depression, and sleep disturbance, but endorsed occasional strange thoughts and some sense of hypervigilance. *Id.* Although Plaintiff denied excess sedation on July 10, 2012, he reported increased depression, difficulty thinking, occasional racing thoughts and obsession with the past. Tr. at 460.

The undersigned finds that the ALJ did not properly consider the side effects of Plaintiff's medications or the difficulty that Plaintiff had in controlling his symptoms with medications. The ALJ based her conclusion that Plaintiff did not have side effects from his medications on two treatment notes from May and July 2012, to the exclusion of multiple references to medication side effects throughout the file and in Plaintiff's

testimony. The record reflects that Plaintiff's physicians discontinued or changed the dosage of at least eight medications because of their side effects or ineffectiveness. *See* Tr. at 293, 315, 401, 415, 426, 428. Despite Plaintiff's many medication changes, he remained symptomatic. *See* Tr. at 412, 451, 454, 457, 460. Dr. Ekechukwu specifically noted that Plaintiff was particularly sensitive to the side effects of medications. Tr. at 416. Although Plaintiff endorsed no side effects from medications in July 2012, he had previously complained of side effects from three of the four medications he was prescribed at that time. *See* Tr. at 364, 410, 416, 419, 424. Plaintiff accepted the side effects of Wellbutrin SR because of its effectiveness. *See* Tr. at 416. It also appears that he attempted to minimize his general side effects by only taking Remeron and Vistaril when his symptoms were exacerbated. *See* Tr. at 451, 454, 457. In light of well-documented evidence of Plaintiff's medication side effects and difficulty finding effective medications, his psychiatrist's suggestion that he was particularly sensitive to the side effects of medications, and his documented efforts to cope with and minimize his side effects, the undersigned finds that the ALJ did not properly consider the effectiveness and side effects of Plaintiff's medications in assessing his credibility.

3.     Medical Source Opinions

a.     Ms. Barnes' Statements

Plaintiff argues the ALJ violated SSR 96-2p by failing to specify the weight accorded to Ms. Barnes' statements. [ECF No. 26 at 19]. The Commissioner maintains that Ms. Barnes was not an acceptable medical source and was, thus, incapable of rendering a treating source's opinion. [ECF No. 28 at 22]. Nevertheless, the

Commissioner argues that the ALJ evaluated Ms. Barnes' opinion based on the guidelines set forth in SSR 06-03p. *Id.* at 23.

The ALJ accorded "some weight" to Ms. Barnes' statements, but noted that Ms. Barnes "largely repeated claimant's own subjective statements rather than rendering professional, independent opinions" and that mental health treatment notes indicated Plaintiff's condition had been "generally stable since the end of 2010." Tr. at 32.

Pursuant to 20 C.F.R. §§ 404.1527(b) and 416.927(b), the ALJ must consider all relevant evidence in the case record when determining whether a claimant is disabled. *See also* SSR 06-3p. However, medical opinions may only be rendered by "acceptable medical sources," which include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-3p; *see* 20 C.F.R. §§ 404.1513(a), 416.913(a). "Other sources" are defined as individuals other than acceptable medical sources and include medical providers, such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists, as well as non-medical sources, such as educational personnel, social welfare agency personnel, rehabilitation counselors, spouses, parents, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d). Medical opinions must be considered based on the criteria set forth in 20 C.F.R. § 404.1527(c), but opinions from "other sources" are not medical opinions. SSR 06-3p. While the factors in 20 C.F.R. § 404.1527(c) and 416.927(c) do not have to be explicitly considered in evaluating the opinions of other medical sources, they represent basic principles for the consideration of all opinion evidence. *Id.* "The

evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case," and should be based on "consideration of the probative value of the opinions and a weighing of all evidence in that particular case." *Id.*

The undersigned concludes that the ALJ properly considered Ms. Barnes' opinion based on the evidence in the record. Because Ms. Barnes was a counselor and not an acceptable medical source, the ALJ was not required to strictly assess her opinion based on the criteria in 20 C.F.R. §§ 404.1527(c) and 416.927(c). However, the ALJ was guided by those criteria, which include the examining relationship, the treatment relationship (including length of treatment relationship and frequency of examination and nature and extent of treatment relationship), the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the provider. *See* 20 C.F.R. §§ 404.1527(c) and 416.927(c). Plaintiff testified that he began treating with Ms. Barnes after he was hospitalized in February 2010. Tr. at 55. Therefore, the record suggests that Ms. Barnes had an examining and treatment relationship with Plaintiff, which the ALJ acknowledged. Tr. at 32. However, Ms. Barnes did not indicate how frequently Plaintiff participated in therapy or include any treatment notes to corroborate her statement, so the treatment relationship was unclear. *See* Tr. at 437. Likewise, Ms. Barnes' statement lacked supportability because it could not be corroborated by treatment notes. The ALJ acknowledged that Ms. Barnes' statement was consistent with some indications in the record, but indicated additional restrictions that were not verified in the psychiatrists' treatment notes. *See* Tr. 32. The undersigned agrees

43

that Ms. Barnes suggested some limitations that were not documented in those records. The ALJ acknowledged Ms. Barnes' specialization as a mental health counselor. Tr. at 32. The undersigned finds that the ALJ was guided by the factors in 20 C.F.R. § 404.1527(c) and 416.927(c), and that she reasonably gave "some weight," as opposed to controlling weight to Ms. Barnes' opinion in the absence of corroborative records. However, the undersigned directs that that ALJ should reconsider Ms. Barnes' opinion on remand if additional records are provided to corroborate her opinion.

b.     State Agency Consultants' Opinions

Plaintiff contends the ALJ accorded unjustified weight to the opinions of the non-examining state agency consultants. *Id.* at 21–22. Plaintiff further maintains that, while the ALJ suggested she gave significant weight to Dr. King's opinion, she neglected to consider specific indications provided by Dr. King that suggested Plaintiff was unable to work. *Id.* at 18–19. The Commissioner argues that the ALJ's decision to accord significant weight to the opinions of Drs. Calhoun and King was supported by substantial evidence and that the ALJ correctly interpreted the limitations in Dr. King's opinion to be temporary restrictions that would last for less than 12 months. [ECF No. 28 at 22].

The ALJ accorded significant weight to the opinions of Drs. King and Calhoun based on their "substantial experience applying Social Security disability law and policy," review of "evidence from varied sources," and "detailed rationale for their conclusions." Tr. at 32. She also noted that the Dr. Calhoun's assessment and Dr. King's assessment were consistent with one another. *Id.*

The undersigned has reviewed Dr. King's opinion, and accepts the Commissioner's argument that the restrictions identified were for less than a 12-month period. *See* Tr. at 338–50. Dr. King indicated Plaintiff was "expected to be able to perform simple unskilled work by 2/11." Tr. at 350. He also indicated that he gave controlling weight to the September 2010 record from the mental health center, which suggested an unremarkable mental status examination. *Id.* He stated that Plaintiff's status would likely remain unremarkable if he was complaint with medication. *Id.* The undersigned finds that Dr. King's opinion was speculative. Furthermore, it failed to reflect problems with medications and symptoms that were documented in subsequent treatment notes. Therefore, the undersigned finds that the ALJ erroneously gave significant weight to Dr. King's opinion, which was not supported by substantial evidence.

The undersigned also finds that the ALJ improperly gave significant weight to Dr. Calhoun's opinion. It does not appear that Dr. Calhoun considered Plaintiff's hospitalizations. *See* Tr. at 379 (selected "none" with regard to episodes of decompensation), 381 (failed to cite records from hospitalizations). He also failed to properly considered Plaintiff's activities of daily living, noting the activities that Plaintiff could perform, but failing to note his restrictions in performing those and other activities. *See* Tr. at 381. Dr. Calhoun based his assessment on one mental health treatment note from November 2010 and the consultative examination report from Dr. Ritz, which fail to reflect subsequent problems in regulating Plaintiff's medications and controlling his symptoms and side effects. *See id.* Because Dr. Calhoun's opinion was not based upon

the entire record, the undersigned finds that the ALJ's decision to accord it significant weight was unsupported by substantial evidence.

c.     Dr. Hunt's opinion

Plaintiff argues that the Commissioner neglected to consider Dr. Hunt's records and opinion, which he included as an attachment to his motion to admit new evidence. [ECF No. 26 at 20–21]; [ECF No. 10-3]. Plaintiff argues Dr. Hunt's records are material because they contain a statement in which Dr. Hunt indicated Plaintiff was permanently disabled and that his primary disabling diagnosis was bipolar disorder. [ECF No. 10-1 at 2–3]. Although Plaintiff initially argued that there was good cause for his failure to admit the evidence at the administrative level, he subsequently indicated in his brief that, upon review of the record, he discovered that most of the evidence he sought to admit was submitted at the administrative level and appeared in the record. [ECF No. 26 at 20].

The Commissioner argues that the additional records and opinion from Dr. Hunt were not material and that Plaintiff did not demonstrate good cause for his failure to submit the records at the administrative level. [ECF No. 18 at 2–5].

The undersigned denies Plaintiff's motion to admit the additional evidence as moot. "[T]he mootness doctrine usually requires a court to dismiss an action in which, because of events occurring after the plaintiff filed the suit, any relief the court might grant would be of no utility to the plaintiff." *Ogunde v. Holder*, 563 F. App'x. 237 (4th Cir. 2014) (*citing Central States, Se. & Sw. Areas Pension Fund v. Central Transp., Inc.*, 841 F.2d 92, 93 (4th Cir. 1998); *Tucker v. Phyfer*, 819 F.2d 1030, 1034 n. 3 (11th Cir. 1987). In light of Plaintiff's admission that the evidence that he sought to admit,

including Dr. Hunt's opinion, was already in evidence, it would provide no utility to Plaintiff for the undersigned to decide if the ALJ had a duty to acquire the evidence before making a decision.

Furthermore, the undersigned declines to address the Commissioner's consideration of Dr. Hunt's opinion. Although the Appeals Council determined that Dr. Hunt's opinion concerned a period after the date of the ALJ's decision, the ALJ will have the opportunity to consider Dr. Hunt's opinion and the additional records on remand.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

The undersigned also denies as moot Plaintiff's motion to admit new evidence. [ECF No. 10].

IT IS SO ORDERED.

February 13, 2015                                    Shiva V. Hodges
Columbia, South Carolina                        United States Magistrate Judge